I.GOTHARD, Judge.
In this medical malpractice action, defendants, Dr. John Salmon, Salmon Chiropractic Clinic and National Chiropractic Mutual Insurance Company, appeal from a Judgment Notwithstanding the Verdict (JNOV), which also conditionally granted plaintiffs Motion for New Trial. The judgment overruled the jury’s verdict and awarded damages to plaintiff, Jerry Eu-banks for a ruptured cervical disc. For reasons that follow, we affirm.
Mr. Eubanks, a fireman, sought treatment on September 4,1991 from Dr. Salmon for low back pain which occurred when he helped carry ice chests up some stairs during the Labor Day weekend. The doctor treated Mr. Eubanks with heat, ice, electrical stimulation and manipulation. He also began manipulating plaintiffs neck sometime around September 6, 1.4.991. On September 30, 1991, Mr. Eubanks alleges that Dr. Salmon manipulated his neck, causing immediate pain. Mr. Eubanks connects this incident with the rupture of his cervical disc, which was subsequently discovered. The rupture impinged on a nerve and resulted in a fusion. Following the surgery, he spent three days in the hospital, was off of work for six weeks, and spent six weeks on light duty.
As a result, plaintiff filed a medical malpractice action against defendants. On September 28, 1993, the medical review panel found no breach of the standard of care and no liability. Suit was filed on October 26, 1993. On December 22, 1993, an intervention was filed by Louisiana Health Service Indemnity Company d/b/a Blue Cross/Blue Shield of Louisiana for the recovery of medical payments. A jury trial was held on January 26-28, 1998. The jury found no liability. A judgment dismissing plaintiffs claim was rendered on February 2, 1998. On February 6, 1998, plaintiff filed a motion for JNOV and, alternatively for a new trial. On March 4, 1998, the trial judge granted the motion for JNOV, without ruling on the plaintiffs motion for New Trial. In the JNOV, the trial judge awarded plaintiff $135,000 in general damages and $12,-772.76 in medical expenses. The judgment was rendered only against Dr. Salmon. Furthermore, it failed to recognize the intervention.
On March 12, 1998, all of the defendants filed a Motion for New Trial from the JNOV. Defendants asserted that the judgment was manifestly erroneous and that the award was excessive. In addition, defendants contended that it violated the limitations on general damages under the Medical Malpractice Act, and that it failed to award the intervener its | ¿medical payments. On March 31,1998, plaintiff filed a “Motion for Clarification of Judgment.” Plaintiff asserted that the judgment failed to include the other two defendants, that it should find joint and several liability among the defendants, and that it failed to include an award for the intervener. On April 6, 1998, the intervener filed a similar motion, entitled “Motion to Modify and/or Amend Judgment” asking for inclusion of its lien in the judgment against defendant. This is marked “Moot” because the trial judge rendered an “amended” judgment on that date pursuant to plaintiffs motion to clarify. In addition, a minute entry on April 6, 1998, indicates that the trial judge denied a Motion for New Trial, (which appears to be the motion filed by defendants on March 12.)
The judgment of April 6 granted the plaintiffs “Motion to Clarify ... It reiterated that the JNOV was granted, reduced plaintiffs award to $100,000 in general damages, reserved plaintiffs right to seek excess damages from the Louisiana Patient’s Compensation Fund, and awarded the intervener the sum of $12,772.76.
Defendants filed an appeal from both the April 6, 1998 “amended” judgment, and the March 4, 1998 JNOV. This Court determined that the appeal was premature because the trial judge had not ruled on plaintiffs original Motion for New Trial filed with the Motion for JNOV in Febru *519 ary 1998. The appeal was dismissed and the ease remanded.
On January 6, 1999, the trial judge rendered a “Second Amended Judgment.” In it, he repeated the content of the April 6, 1998 judgment, but added that plaintiffs Motion for New Trial was denied, unless the JNOV 'was reversed on appeal, in which case plaintiff s Motion for New Trial |Rwas granted.' As -he did in the first JNOV, the trial judge determined that the jury disregarded the charges on causation, and that the facts and inferences point so strongly and overwhelmingly in favor of plaintiff that reasonable men could not have arrived at a contrary verdict. This judgment again casts only Dr. Salmon in judgment, and fails to include the other two defendants, Salmon Chiropractic Clinic and National Chiropractic Mutual Insurance Company. Nevertheless, all three defendants appealed the JNOV of March 4, 1998, the amended judgment of April 6, 1998, and the second amended judgment of January 6,1999.
On appeal, defendants assert that the trial judge erred in granting plaintiffs motion for JNOV, and conditionally granting plaintiffs Motion for New Trial from the original judgment in favor of defendants.
INVALID JUDGMENTS
Before addressing the merits of the appeal, we note that the only valid judgments before this Court are the March 4, 1998 judgment that initially granted the JNOV and awarded plaintiff damages and medical expenses against Dr. John Salmon, and the ruling on the plaintiffs Motion for New Trial rendered pursuant to our decision of January 5, 1999 remanding the case. Both the April 6, 1998 judgment, and those parts of the January 6, 1999 judgment that reiterate the changes made in the April 6, 1998 judgment, are invalid.
A final judgment' may not be amended after it is rendered, except for the reasons set out in LSA-C.C.P.- article 1951. That article provides that the judgment may be amended by the trial court at any time “(1) To alter the phraseology of the judgment, but not the substance; or (b) To correct errors [fiof calculation.” Both the April 6, 1998 judgment and parts of the January 6, 1999 judgment contain substantive changes to the March 4, 1998 judgment because they reduce (or change) plaintiffs monetary award, and add an award to the intervener for monetary relief. Furthermore, neither of these judgments are rendered pursuant to a timely motion for new trial. See, LSA-C.C.P. article 1974. Thus, neither of those judgments are valid and properly before this Court.
EVIDENCE
At the trial on the merits, Mr. Eubanks testified that he is a fireman for the Department of the Navy, at the Naval Air Station in Belle Chasse. As part of his employment he was required to undergo a physical examination annually. He testified that prior to September, 1991, he played softball, did some fishing and hunting, and did some remodeling work as a side job.. He explained that on Labor Day in 1991, he strained his lower back lifting an ice chest. He sought treatment for the injury from defendant, Dr. Salmon. Dr. Salmon took X-rays of plaintiffs lower back, but not his neck.
After about four visits, Dr. Salmon began manipulating his neck, although Mr. Eubanks did not complain of a neck problem. By the weekend of September 28, 1991, plaintiff, whose back pain was resolved, played softball, and went fishing.
. Mr. Eubanks testified that when he told Dr. Salmon his back felt fine, the. doctor wanted to keep him on a maintenance program. In order to get insurance coverage for the continued treatments, Dr. Salmon began manipulating his neck. Plaintiff testified that Dr. Salmon told him it was necessary to “come up with another diagnosis” for insurance purposes.
|70n September 30, 1991, Mr. Eubanks got up at five in the morning to go fishing. *520 He returned home at about two in the afternoon. He had a previously set appointment with Dr. Salmon for four o’clock. Although Mr. Eubanks kept the appointment, he considered not doing so because he was feeling fíne. Dr. Salmon came into the room and told Mr. Eubanks to lie down. The doctor began manipulation of the back. Plaintiff told Dr. Salmon that his back problem was resolved and he sat up on the table. Dr. Salmon came up behind plaintiff and put his hand on the top of his head. Then he put the other hand in the curvature of Mr. Eubanks’ neck and began moving the head. Dr. Salmon told plaintiff to relax. Dr. Salmon then twisted Mr. Eubanks’ neck both ways. Mr. Eubanks testified that he felt immediate pain shooting from his neck down through the shoulder and the arm. Plaintiff immediately told Dr. Salmon about the pain but the doctor seemed unconcerned and assured him all would be well.
Mr. Eubanks contends that until the September 30 neck manipulation, he had no problem with his neck. After that day, however, he needed extensive treatment. Mr. Eubanks further asserts that Dr. Salmon only X-rayed his neck upon plaintiffs insistence after September 80.
Mr. Eubanks continued treatment with Dr. Salmon through October, with no results. Mr. Eubanks used Alieve and Ibuprofen and heat packs to ease the pain in his neck. When his condition did not improve, he consulted Dr. Charles Anastasio, an orthopedic surgeon, on October 17, 1991.
Dr. Anastasio testified that Mr. Eu-banks complained of right shoulder and neck pain beginning approximately 2^ weeks before. Dr. Anastasio took X-rays which showed one bony spur and some degeneration at C4-5, |abut no herniated disc. Plaintiff did not complain of radiating pain at that time. He treated plaintiff with traction in the office. Dr. Anastasio diagnosed plaintiff with cervical strain and pre-existing degenerative disc disease.
After conservative treatment did not improve plaintiffs condition, an Magnetic Resonance Imaging (MRI) test was performed on December 3, 1991. The test showed degenerative disc disease at C4-5 and C5-6. C4-5 had a mildly bulging disc and C5-6 showed a focal central disc protrusion indenting the sac around the disc space. Dr. Anastasio noted that there are several stages of a deteriorating disc that may occur. The first is the loss of hydration in the disc, causing it to become lax. In some patients, the deterioration proceeds to the second stage, which is a bulging disc. The third stage is a rupture, which occurs in approximately 5% of the population. In a rupture or herniation, the disc protrudes outside of its confined areas. That is what occurred with plaintiff. Dr. Anastasio testified that the test did not reveal definite pressure on the nerve root or spine. He stated that degenerative changes are common in plaintiffs age group. Because of the rupture, Dr. Anas-tasio referred plaintiff to the neurosurgeon who subsequently fused the disc.
Dr. Anastasio testified he was not trained in chiropractic medicine, nor was he an expert in the field. He is not familiar with manipulation as a treatment form. However, he stated that he has seen patients with bad results from chiropractic manipulation, and described that as his “speciality”. In his opinion, an individual with degenerative disc disease should never be subjected to manipulation because such a procedure | introduces a high risk of injury. He testified that any kind of traumatic episode to the neck, including manipulation, might rupture the disc.
Dr. Carlos Gorbitz, a neurosurgeon, saw plaintiff in December 1991. He ordered a mylogram on December 9, 1991, which showed a small disc herniation between C4-5 and a larger one at C5-6. The C5-6 herniation was putting pressure on the nerve root on the right side. Based on the history given by plaintiff, he concluded *521 that the disc ruptured from the manipulation on September 30,1991.
Dr. Gorbitz testified that he is familiar with what chiropractors do and has treated a number of patients after they have been to chiropractors. He explained that manipulations are passive or forceful movements of the neck. That can produce injuries. He stated that manipulation of the neck should never be done on a patient with degenerative disease. He opined that in .this case the injury is probably related to a manipulation, rather than a trauma.
Dr. Gorbitz performed an anterior cervical discectomy and fusion. During the procedure, he actually performed two “surgeries”. First, he removed a section of bone from plaintiffs hip. He then inserted the bone between the discs and fused it. Dr. Gorbitz stated that there is much pain, most of which comes from removing the bone from the hip. Dr. Gorbitz testified that plaintiff will be more susceptible to other disc problems in the future because the other discs have to do the work of the one that has been removed. He said that plaintiff should avoid overhead work and repetitive bending. Dr. Gorbitz testified that plaintiff has 10-15% total disability from the surgery.
| inDr. Gorbitz stated that it is documented in the literature in this area that manipulation can cause disc herniation, particularly if the patient has degenerative disc disease. Dr. Gorbitz stated that the decision to order tests, such as X-rays, depends on the examination findings. If they are severe or there is evidence of neurological problems, objective tests would be warranted.
The defense offered evidence from Dr. Salmon who contended that he did not “manipulate” the neck. Manipulation is a method of treatment and he only manipulates patients while they are laying down, not sitting up. Defendant asserts that he performed a compression examination on plaintiff to determine if there was restriction in the neck area. Defendant testified this examination, in which the neck is flexed while the doctor places some compression pressure on the top of the head, could not have caused a ruptured disc. Defendant further testified that plaintiff came in that morning complaining about shoulder pain. When plaintiff questioned why he was working on his neck, defendant told him that neck injuries could cause the type of pain plaintiff mentioned. However, the examination disclosed no restrictions. Because the symptoms noted by plaintiff were mild, defendant did not think that X-rays or other tests were warranted. Defendant testified that plaintiff did not complain of either shooting or radiating pain when defendant performed the examination. However, plaintiff telephoned later that day to inform defendant that his neck was hurting. Defendant felt that plaintiff pulled a muscle when he played ball over the weekend and told him so. He prescribed heat and over the counter anti-inflammatory medication.
InDr. Clifford Ameduri, an orthopedic surgeon and expert in physical medicine and rehabilitation, appeared on behalf of the defendant. Dr. Ameduri testified that his specialty is in the non-operative treatment of muscle, skeletal and nerve problems. In conjunction with his specialty, he was trained in manipulation by osteopathic doctors and has specific chiropractic training. In addition, he has participated in continuing education of a chiropractic nature for many years.
Dr. Ameduri reviewed plaintiffs records and X-rays and found no contraindications against manipulating plaintiffs neck. He said he had done manipulation on patients with similar findings and that manipulation is an important part of the treatment for neck and back problems. He testified that-defendant did not do anything wrong in his treatment of plaintiff and that his treatment is not related to the eventual surgery.
As to the testing protocol, Dr. Ameduri stated that an X-ray is a tool for diagnosis, but is not necessary for everyone. He *522 orders X-rays for all of his patients, but does so more for legal reasons than medical ones. Dr. Ameduri does not believe that the manipulation could have exaeerr bated any existing- problems with plaintiffs neck. He does not believe that anything happened on September 30 to trigger plaintiffs pain.
Dr. William Ellender, an expert chiropractor, testified that he was on the medical review panel which unanimously found that defendant did not breach the standard of care for chiropractic treatments. He reviewed all of plaintiffs medical records and the depositions. Dr. Ellender first explained that manipulation restores a patient’s range of motion to a restricted joint, and that it also decreases pain. After his review of the medical records, he | ^concluded that there was nothing to contraindicate chiropractic manipulation of the cervical area. He stated that plaintiff had a mild case of degenerative joint disease and that patients with these type of findings are manipulated by chiropractors regularly, including himself. He further asserted that the type of manipulation performed by defendant is accepted in the field. He noted that after manipulation some soreness is expected, but it usually subsides in a day or two.
Dr. Ellender stated that X-rays are not necessarily indicated when a patient complains of pain. Chiropractors do not order X-rays just to do them because of the danger of overexposure to radiation. The chiropractic guidelines for when to order X-rays are: when there is significant trauma, loss of weight, severe neurological deficits (such as numbness or loss of strength), fever, drug use, age 50 or older, or previous history of cancer. Thus, it was not a breach of the standard of care not to take X-rays in this case during the time plaintiff was being treated. Furthermore, the cervical compression examination that defendant performed on September 30, 1991 was the accepted procedure for the complaints. Dr. Ellender noted that this examination is a range of motion test and could not have herniated the disc. He stated that based on studies on cadavers, it has been shown that twisting the lumbar spine will not herniate a disc until the bony segments in back of the spine are fractured. He believes that this same conclusion can apply to the cervical spine.
Dr. Ellender explained that the natural transition of a disc herniation is neck pain followed in a week or so by radiating pain, which is followed by numbness or tingling in the extremity. Dr. Ellender noted that plaintiff did li3not complain of radiating pain until November 27,1991, when he was being treated by Dr. Anastasio. Defendant stopped treating plaintiff on October 17, 1991, over one month earlier. Dr. El-lender emphatically concluded that defendant neither breached the standard of chiropractic care in his treatment of plaintiff, nor did he cause the ruptured disc.
The trial judge reasoned that the JNOV was warranted because the evidence was overwhelming on causation. We agree. The testimony offered by the plaintiff and the treating physicians support that view. The trial court is silent on the issue of whether there was a breach of the standard of care.
LAW
LSA-R.S. 9:2794 provides, as follows, for the burden of proof in medical malpractice actions and jury charges to be submitted in actions against chiropractic physicians:
A. In a malpractice action based on the negligence of a ... chiropractic physician licensed under R.S. 37:2801 et seq., the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by ... chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular spe *523 cialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by ... chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care [14and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred....
C. In medical malpractice actions the jury shall be instructed that the plaintiff has the burden of proving, by a preponderance of the evidence, the negligence of the ... chiropractic physician. The jury shall be further instructed that injury alone does not raise a presumption of the ... chiropractic physician’s negligence. The provisions of this Section shall not apply to situations where the doctrine of res ipsa loquitur is found by the court to be applicable.
LSA-C.C.P. article 1811 provides in pertinent part that a judge may grant a Judgment Notwithstanding the Verdict. However, that article does not set the grounds for such a grant by the trial court. In Scott v. Hospital Service District No. 1, 496 So.2d 270 (La.1986), our Supreme Court set the criteria that a JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. See also, Anderson v. New Orleans Public Service, 583 So.2d 829 (La.1991).
We recognize that generally a plaintiff must establish a causal connection between a defendant’s negligence and the injury, and that a defendant breached the degree of care ordinarily practiced by chiropractic physicians within the involved medical specialty. However, the absence of expert testimony as to the standard of care does not defeat plaintiffs case. When, as in the instant matter, the physician does an obviously careless act from which a lay person can infer negligence, expert testimony is unnecessary. Pfiffner v. Correa, 94-0924, 94-0963, 94-0992 (La.10/17/94), 643 So.2d 1228. In that case the Louisiana Supreme Court held that:
. expert testimony is not always necessary in order for a plaintiff to meet his burden of proof in establishing a medical malpractice claim. Though in most cases, because of the complex medical and factual issues involved, a plaintiff will likely fail to sustain his burden of proving his claim under LSA-R.S. 9:2794’s requirements without medical experts, there are instances in which the medical and factual issues are such that a lay jury can perceive negligence in the charged physician’s conduct as well as any expert can, or in which the defendant/physician testifies as to the standard of care and there is objective evidence, including the testimony of the defendant/physician, which demonstrates a breach thereof. Even so, the plaintiff must also demonstrate by a preponderance of the evidence a causal nexus between the defendant’s fault and the injury alleged.
Id. 643 So.2d at 1234.
In the instant case two experts, admittedly in different fields, but with expert knowledge of the neck and spine concluded that manipulation should never be performed on a person with degenerative disease. Further, it is evident from the testimony that Mr. Eubanks had no trouble with his neck and any manipulation is therefore suspect. Given the facts of this case, we cannot say the trial court erred in overruling the jury verdict. Accordingly, we affirm the trial court.
AFFIRMED.
CANNELLA, J., dissents with reasons.