MARION F. EDWARDS, Judge.
 

 | ¡¡Plaintiff/appellant, Valerie Durapau (“Ms. Durapau”), appeals an adverse decision of the trial court in an action for damages resulting from an automobile accident. The judgment on appeal is a judgment in which the trial court adopted a jury determination that defendant/appel-lee, Diane Kallenborn (“Ms. Kallenborn”), was negligent in the accident, but that negligence was not the legal cause of the accident. For reasons that follow, we affirm.
 

 Ms. Durapau filed this action seeking damages as a result of a traffic accident that happened on January 23, 2007 at the intersection of Metairie Road and Magnolia Drive in Metairie, Louisiana. Ms. Du-rapau was riding a small motor scooter, traveling East on Metairie Road toward New Orleans. Ms. Kallenborn was driving a sports utility vehicle (“SUV”) on Magnolia Drive. The two vehicles collided at the intersection, which is controlled by a traffic light. Ms. Durapau suffered multiple injuries as a result of the accident. Ms. Durapau filed a |3negligence action, naming Ms. Kallenborn and her insurer, State Farm Mutual Automobile Insurance Company (“State Farm”), as defendants in the lawsuit.
 

 The matter went before a jury for trial, after which the jury returned a verdict form containing the following questions and answers:
 

 1. Do you find Diane F. Kallenborn negligent in regards to the motor vehicle accident of January 23, 2007? Yes 10 No 2
 

 If the answer to this question is “Yes”, please proceed to question No. 2. If the answer to this question is “No”, please stop here. Do not answer any further questions. Sign this form and notify the bailiff.
 

 2. Was the negligence of Diane F. Kal-lenborn a legal cause of the motor vehicle accident of January 23, 2007? Yes 3 No 9
 

 Subsequently, the trial court adopted the jury verdict and rendered judgment in accordance with the above determinations. Ms. Durapau filed a motion for judgment notwithstanding the verdict (JNOV) or, alternatively, for a new trial. The motion was denied by the trial court, and this appeal followed.
 

 FACTS
 

 At the trial on the merits, the parties stipulated that Ms. Durapau’s medical expenses totaled $29,918, of which $24,277 has been waived by health care providers. Five thousand six hundred forty-two dollars ($5,642) is still owed to health care providers. The parties also stipulated that the injuries consist of a left tibia fibula fracture, which required surgery and the insertion of a rod. Other injuries included a concussion, facial lacerations, and multiple contusions. Additional stipulations established State Farm as Ms. Kallenborn’s insurer and introduced medical records, wage and earnings documents, and photos into the record.
 

 |4Ms. Durapau testified that she is a student at the University of New Orleans and works at the House of Blues as a waitress. On the day of the accident, she
 
 *1203
 
 left hex
 
 [1]
 
 mother’s home on Bath Street at about 3 p.m. She traveled down Labarre Road and turned left onto Metairie Road on her way to her home on Papworth Street. She was driving a scooter and traveling about 30 miles per hour. She was wearing a helmet. As she approached Haynes Middle School, about 150 feet away from the intersection of Metairie Road and Magnolia, Ms. Durapau saw that the light was green. About ten feet before she reached the intersection, the light turned yellow. Ms. Durapau saw an SUV stopped on Magnolia Street, “inching up forward.” Ms. Durapau testified that she assumed the SUV intended to make a right turn on the red light and was checking to see if there were any vehicles coming. However, Ms. Durapau recalled seeing the SUV “shoot out in front” of her just before the impact. Ms. Durapau assumed that Ms. Kallenborn saw the scooter coming, so she did not blow her horn or attempt to brake before she entered the intersection. Ms. Durapau did not recall seeing any witnesses at the scene.
 

 Ms. Kallenborn testified that she was driving a Suburban at the time of the accident. She was on her way home from driving carpool from Jesuit School in New Orleans where her son is a student. She dropped the last child off at his home on Livingston Street and turned onto Magnolia on her way home with her son. She stopped at the red light at the intersection of Magnolia and Metairie Road. Ms. Kal-lenborn testified that traffic was heavy because it’s the time of day that schools are letting out. She was stopped at the red light for about 30 seconds. When the light turned green, she looked left and right and then proceeded into the intersection. When she got to the middle of Mé-tame Road, she saw a scooter traveling toward her on Metairie Road. It did not slow down or veer off. The scooter rammed into the rear door on the driver’s side of the SUV.
 

 1 ¡Ms. Kallenborn testified that she could not open her door because of damage sustained in the collision. She climbed over the back seat to check on her son then got out to check on the driver of the scooter. There were several people around who called 9-1-1. Ms. Kallenborn made calls to a neighbor and her husband. While she was calling, a woman, later identified as Beverly Scala (“Ms. Scala”), was helping Ms. Durapau. Ms. Durapau was screaming and in obvious pain. Ms. Scala tried to put something under Ms. Durapau’s head. Ms. Durapau asked what happened and Ms. Scala told her, “Honey, you ran a red light.” Ms. Kallenborn explained that, although Ms. Scala lives nearby, the two women did not know each other before the accident.
 

 Ms. Kallenborn testified that two police officers came to the scene shortly after the accident. One of the officers told her to move her car off to the side and she complied. Ms. Scala told one of the officers she witnessed the accident and gave details. Ms. Kallenborn also gave the officer her account of what happened.
 

 Ms. Kallenborn stated that she has lived in the area for about eight years and was familiar with the intersection and the sequence of lights. She stated that, when the light turns red for Metairie Road traffic, the light turns green for Magnolia first than for Codifer, assuming there are cars on Magnolia waiting for the light.
 

 Ms. Kallenborn stated with certainty that she waited until the light on Magnolia was green before entering the intersection. She denied anticipating the light and going forward while the light was still red. She saw the motorcycle driving on Metairie Road about to hit her car, but she could not be precise about how many seconds that was before the impact happened.
 
 *1204
 
 However, Ms. Kallenborn testified that she was in the center of Metairie Road when she saw Ms. Durapau coming, and there was no way to avoid the accident.
 

 IfiMs. Scala testified that she lives about two blocks away from the intersection at which the accident occurred. She was stopped at a red light on Codifer when she witnessed the accident. She was in the left lane and could see the light facing Metairie Road. It was green at the time. The light went from green to yellow and finally to red. A few seconds later, Ms. Scala saw a motor scooter approaching the intersection, traveling eastbound on Me-tairie Road. The scooter ran into the side of a truck that had entered the intersection from Magnolia Street. Ms. Scala estimated the speed of the motor scooter at about
 
 35
 
 miles per hour. Ms. Scala pulled over, parked her car, and went over to see if she could help the motor scooter rider. The rider had a large gash in her chin and her leg appeared to be broken. The rider asked Ms. Scala what happened, to which Ms. Scala replied, “Baby, you ran a red light.”
 

 Ms. Scala also testified that Officer Lamar Hooks, Jr. (“Officer Hooks”), with whom Ms. Scala is acquainted, was driving by and stopped to direct traffic until the investigating officer arrived on the scene. Shortly afterward, Officer Dominick Im-bornone (“Officer Imbornone”) arrived and conducted the accident investigation. Ms. Scala testified that she also knows Officer Imbornone’s wife.
 

 Officer Imbornone testified at trial regarding his investigation of the accident. He stated that, when he arrived on the scene, there was a motor scooter lying on top of the rider in the intersection of Me-tairie Road and Magnolia Street. The second vehicle involved was an SUV parked on the corner of Codifer Street and Me-tairie Road. Officer Hooks was already there, directing traffic and rendering aid to Ms. Durapau. Officer Hooks had called emergency medical personnel, who had not yet arrived.
 

 Ms. Durapau was in extreme pain, so Officer Imbornone was unable to get a statement from her. However, he did obtain statements from Ms. Kallenborn and |7Ms. Scala. Ms. Scala told Officer Imbor-none that Ms. Kallenborn was stopped at the red light at Magnolia. When the signal turned green, she proceeded onto Me-tairie Road and was struck by a motor scooter traveling eastbound on Metairie Road that ran a red light.
 

 Officer Imbornone confirmed Ms. Scala’s testimony that his wife had formerly worked for Ms. Scala but had quit about four years before the accident. He stated that nothing in that relationship affected this accident report.
 

 Officer Hooks testified that he was driving eastbound on Metairie Road at the time of the accident. There were about ten cars in front of his as he stopped for the red light at Magnolia. When the light turned green and traffic did not move, he became aware of a problem at the intersection. Officer Hooks turned on the lights on his police car and drove up a turning lane to discover the cause of the obstruction. He saw Ms. Durapau on the ground and her motor scooter was on top of her. The SUV was parked off to the side.
 

 Ms. Scala was there trying to help Ms. Durapau. Officer Hooks’ first concern was to aid Ms. Durapau, who was in great pain. He called in to report the accident and to get medical help for Ms. Durapau.
 

 Officer Hooks testified that he has known Ms. Scala for about twenty years because he is friends with Ms. Scala’s son. Ms. Scala told Officer Hooks that she saw the suburban cross the intersection and
 
 *1205
 
 the motor scooter run the red light and hit it.
 

 Officer Hooks also stated that he recalled seeing Ms. Scala in the Shell Service Station parking lot at the intersection of Metairie Road and Codifer as he was driving up Metairie Road to the intersection.
 

 Stephen Strength (“Mr. Strength”), a civil engineer employed by the Louisiana Department of Transportation and Development as the District Traffic |sOperations Engineer, testified as an expert witness.
 
 [1]
 
 Mr. Strength explained that he is responsible for conducting studies related to improving safety and efficiency of the State highway system within the New Orleans Metropolitan Area. His department oversees the maintenance and operation of traffic signals, signs, striping, setting of speed limits, and other related responsibilities.
 

 Mr. Strength testified that the intersection at which the accident happened is a merge of Metairie Road, Codifer Street, and Magnolia Street. He explained that on the Codifer and Magnolia approaches to Metairie Road there is a traffic light. There is also a left-turn arrow that comes on simultaneously with the green light on each approach street. To aid in his explanation, Mr. Strength produced a Traffic Signal Inventory form for that intersection dated October 19, 2006, which shows the pattern and sequencing of the traffic lights. He verified that the pattern and sequencing has not been changed since that day and would have been the same on the day of the accident.
 

 Mr. Strength testified that the intersection in question has detectors imbedded in the pavement of all three streets to sense the traffic flow. The detectors adjust the timing of the traffic lights within a pre-set maximum and minimum time as necessary to keep traffic flowing smoothly.
 

 The normal sequence is a green light for both approaches of Metairie Road simultaneously, followed by a green phase for the Codifer approach, followed by one for Magnolia. However, it is possible for the detectors to skip an approach if there is no vehicle there. Once either or both phases to a red light for the approach streets is complete, the light on Metairie Road would turn green and remain so until a vehicle approached on Codifer or Magnolia. Mr. Strength further explained that the span of time for a green light on Metairie Road is from ten to forty-five 13seconds depending on the amount of traffic. However, if there were no traffic on the two side streets, the green light on Metairie Road would stay lit for an unlimited time.
 

 For the green light at Magnolia, the minimum period is three seconds and the maximum is ten seconds. If a vehicle moves onto Metairie Road from Magnolia when the light turns green, and no other vehicle is detected, the light will go to yellow and phase to red. However, the system allows for “passage time” to ensure a vehicle starting out on a green light crosses the intersection safely. Thus, the light will stay green on the side streets longer if another vehicle is detected in the intersection.
 

 Mr. Strength also explained that there is an additional red clearance time during which the light will be red for all three streets. The minimum for the red light hold is 2.4 seconds and the maximum is 3.1 seconds depending on the amount and location of the traffic.
 

 
 *1206
 
 Mr. Strength testified that there were no malfunctions in the traffic light regulating that intersection around the date of the accident according to maintenance records. He further stated that the sensors in the street would be able to detect the small scooter that Ms. Durapau was riding.
 

 Raymond Burkart (“Mr. Burkart”), an expert in traffic accident reconstruction, testified at trial. He stated that he reviewed the Traffic Signal Inventory, and the depositions of the parties and a witness and the investigating officer. Further, Mr. Burkart went out to the accident scene to conduct an investigation. He took certain measurements and photographs to aid in his reconstruction of the accident.
 

 Mr. Burkart testified that the timing sequence he personally observed in his investigation supported Mr. Strength’s testimony. Mr. Burkart’s testified there is | insome question about where Ms. Scala was located when the accident happened and also discrepancies in the time line. In Ms. Scala’s deposition, she first stated she watched the SUV for about twenty seconds; later, she changed the estimate to about five seconds. Given the detectors and the sequence of the lights, that is a problem.
 

 Mr. Burkart testified that the light facing Metairie Road is visible from Magnolia. His assumption was that Ms. Kallenborn anticipated the green light and entered the intersection early, before the light actually turned green.
 

 LAW AND ANALYSIS
 

 As previously stated, the jury ultimately found that Ms. Kallenborn was negligent, but that negligence was not a legal cause of the accident. The nature of Ms. Kallenborn’s negligence is not evident from the findings of the jury. The trial court adopted the jury’s verdict in a final judgment. A motion for a JNOV was filed by Ms. Durapau and denied by the trial court. In that same judgment, the trial court also denied an alternative motion for new trial and made the verdict of the jury the judgment of the court.
 

 The judgment on review is a judgment denying Ms. Durapau’s motion for JNOV. A JNOV is permissible pursuant to La. C.C.P. art. 1811. The strict criteria for granting a JNOV is predicated on the rule that when there is a jury, the jury is the trier of fact.
 
 [2]
 
 Issues regarding finding of facts and determinations on credibility are within the purview of the trier of fact. A reviewing court does not assess the credibility of witnesses or reweigh the evidence. The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness.
 
 [3]
 

 InConsidering the above principles, the Louisiana Supreme Court has set forth the criteria to be used in determining when a JNOV is proper as follows:
 

 [A] JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. The motion should be denied if there is evidence opposed to the
 
 *1207
 
 motion which is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions .... In making this determination, the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party....
 
 [4]
 

 In reviewing a JNOV, an appellate court must first determine whether the district judge erred in granting the JNOV by using the above-mentioned criteria in the same way as the district judge in deciding whether to grant the motion.
 
 [5]
 
 Thus, the appellate court must determine whether the “facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict.”
 
 [6]
 

 In brief to this Court, Ms. Durapau asserts the decision by the jury, and the final judgment rendered by the trial court adopting that decision, is based on manifestly erroneous factual and legal findings. In support of that assertion, Ms. Durapau argues that causation was not at issue. Consequently, the only issue to be resolved at trial was the negligence of the parties. Specifically, whether one or both drivers ran red lights and the percentage of fault, if any, that should be attributed to Ms. Durapau. In conclusion, Ms. Durapau argues the trial court’s decision to deny the motion for a JNOV was in error.
 

 |12The main thrust of Ms. Durapau’s argument is that, once the jury found negligence in Ms. Kallenborn’s actions, causation is a given. We note that, although Ms. Durapau emphasizes that there was no issue of causation as between the accident and the injuries, that fact does not preclude the issue of legal cause for the accident.
 

 Ms. Kallenborn and State Farm argue that negligence and legal cause are separate elements to be considered by the jury, and that the finding that Ms. Kallenborn’s negligence was not a legal cause of the accident is supported by competent evidence presented at trial.
 

 Ms. Durapau’s cause of action was based on a theory of negligence which requires a duty/risk analysis. A duty/risk analysis involves five elements, which must be proved by the plaintiff: (1) proof that the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) proof that the defendant’s conduct failed to conform to the appropriate standard (the breach element); (3) proof that the defendant’s substandard conduct was a cause-in-fact of the plaintiffs injuries (the cause-in-fact element); (4) proof that the defendant’s substandard conduct was a legal cause of the plaintiffs injuries (the scope of liability or scope of protection element); and (5) proof of actual damages (the damages element).
 
 [7]
 

 Given the above-cited jurisprudence, we agree with Ms. Kallenborn’s assessment that negligence and legal cause are two separate elements which must both be proven in order to be successful in a negligence cause of action. Conversely, we reject Ms. Durapau’s assertion that legal cause is a “given” once negligence is proven.
 

 
 *1208
 
 Ms. Durapau argues that once negligence of a defendant is found in a two-vehicle accident intersectional collision, causation is a given. She further argues 113that a finding of negligence with a finding of no causation is unreasonable. In support of that theory, Ms. Durapau cites
 
 Eubanks v. Dr. John Solomon Chiropractic Clinic, et al.
 

 [8]
 

 Eubanks
 
 is a medical malpractice action in which Mr. Eubanks suffered acute pain immediately after neck manipulation by a chiropractor and was diagnosed with a ruptured cervical disc. The jury found no liability and dismissed plaintiffs action. The trial court granted a JNOV upon a finding by the trial court that “the jury disregarded the charges on causation, and that the facts and inferences point so strongly and overwhelmingly in favor of plaintiff that reasonable men could not have arrived at a contrary verdict.”
 
 [9]
 

 Eubanks
 
 is clearly distinguishable from the matter before us. The issue in
 
 Eu-banks
 
 related to a causal connection between the treatment of the plaintiff and the injury, a matter which has been established in the matter before us by stipulation. It is also an appeal from the grant of a JNOV. The trial court in
 
 Eubanks
 
 used the proper standard for granting a JNOV and, given the facts presented, this Court affirmed the trial court.
 

 Another case relied upon by Ms. Dura-pau is also distinguishable. She cites
 
 Jackson v. A.L. & W. Moore
 
 Trucking
 
 [10]
 
 for the proposition that the only permissible view of the evidence is that Ms. Kallen-born’s negligence was a legal cause of the accident. In Jackson, the jury found that both drivers in an intersectional collision were negligent and assigned fault to each. However, the jury also found that neither was a legal cause of the accident. In that case, the trial judge correctly found that the jury was confused and the verdict was contrary to law and facts. If both drivers were determined to be negligent, and assessed degrees of fault, then there must be a finding of legal cause by the driver(s).
 

 |uIn the instant case, the jury found that Ms. Kallenborn was negligent, although the specific actions leading to that determination are not evident. There was no determination of Ms. Durapau’s negligence. The jury found that, although Ms. Kallenborn’s conduct was substandard, it was not the legal cause of the accident. Under the duty/risk analysis the jury found that, although Ms. Kallenborn had a duty to Ms. Durapau and that Ms. Kallen-born breached that duty, that breach was not within the scope of liability or scope of protection owned to Ms. Durapau.
 

 Ms. Durapau argues in brief that Ms. Kallenborn “simply presumed her light would turn green” and proceeded into the intersection too early. Ms. Durapau argues that the opinion of her expert, that but for Ms. Kallenborn’s “jumping” the light the collision would not have occurred, was not contradicted. Although that may be Ms. Durapau’s determination of the facts, we are reminded that a JNOV should be granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions, not merely when there is a preponderance of evidence for the mover.
 
 [11]
 

 We do not find the evidence presented at trial reaches that high standard. The evidence opposed to the motion is of such
 
 *1209
 
 quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions.
 
 [12]
 
 The jury could have found that Ms. Durapau ran a red light and was the legal cause of the accident and that Ms. Kallenbom’s negligent actions was minor and not a legal cause of the accident.
 

 hfiGiven the jurisprudence and the facts of this case, we do not find the trial court erred in denying the JNOY and affirming the verdict of the jury. Accordingly, we affirm the judgment of the trial court and assign all costs of this appeal to Ms. Dura-pau.
 

 AFFIRMED.
 

 [1]
 

 . Mr. Strength was unable to attend the trial so his testimony was offered by video deposition.
 

 [2]
 

 .
 
 Smith v. State, Dep’t of Transp. & Dev.,
 
 04-1317, 04-1594 (La.3/11/05), 899 So.2d 516.
 

 [3]
 

 .
 
 Castillo v. Clerk of Court for 29th Judicial District,
 
 06-662 (La.App. 5 Cir. 1/30/07), 951 So.2d 1258,
 
 writ denied,
 
 07-0359 (La.3/30/07), 953 So.2d 69.
 

 [4]
 

 .
 
 Joseph v. Broussard Rice Mill, Inc.,
 
 00-0628 (La. 10/30/00), 772 So.2d 94, 99 (citations omitted).
 

 [5]
 

 .
 
 VaSalle v. Wal-Mart Stores, Inc.,
 
 01-0462 (La.l 1/28/01), 801 So.2d 331, 339.
 

 [6]
 

 .
 
 Id.
 
 (quoting
 
 Joseph,
 
 772 So.2d at 99).
 

 [7]
 

 .
 
 Smith v. AFS, Inc.,
 
 08-332 (La.App. 5 Cir. 10/28/08), 998 So.2d 168, 169-170.
 

 [8]
 

 .
 
 99-425 (La.App. 5 Cir. 2/16/00), 756 So.2d 517.
 

 [9]
 

 .
 
 Id.
 
 at 519.
 

 [10]
 

 . 609 So.2d 1064 (La.App. 2 Cir. 1992).
 

 [11]
 

 .
 
 Joseph v. Broussard Rice Mill, Inc., supra.
 

 [12]
 

 .
 
 Id.