WICKER, J.
| defendant appeals the trial court’s judgment rendered following a bench trial, ordering her to return certain jewelry to plaintiff. For the following reasons, we find the trial judge was not manifestly erroneous in her finding that plaintiff did not intend to irrevocably give the jewelry at issue to defendant. Accordingly, we affirm the trial court judgment.
FACTUAL AND PROCEDURAL BACKGROUND
This litigation arises out of a dispute between two former friends, Mrs. Kathy Blanton and Mrs. Beverly Napier, concerning the ownership of two pieces of jewelry — a pair of 3.5 carat diamond earrings and a multi-strand pearl bracelet. Mrs. Blanton’s deceased former husband, Greg DuTreil, worked with Mrs. Napier and, through work-related social events, Mrs. Blanton (then, Mrs. DuTreil) and her husband and Mrs. Napier and her husband became good friends. The two couples were good friends for approximately thirty years. In 1984, Mr. DuTreil won a one-million dollar sweepstakes and, as part of that award, he was given loose diamonds that were subsequently made into diamond earrings.
On numerous occasions, Mrs. Napier borrowed various pieces of jewelry from Mrs. Blanton, including the diamond earrings and pearl bracelet at issue in this litigation. In August of 2008, following a gathering at Mrs. Napier’s home, Mrs. Blanton and Mrs. Napier sat at the kitchen table talking. The two women testified to the contents of this “emotional” conversation. Mrs. Blanton testified that in that conversation, she told Mrs. Napier that she intended to leave the diamond earrings to Mrs. Napier in her will and that Mrs. Napier seemed “genuinely moved.” She further testified however that she wanted Mrs. Napier to have physical possession of *316 the earrings prior to her death because, at that time, her health appeared to be fading and her husband, Mr. DuTreil, had been terminally ill |2for years. She explained that she and Mr. DuTreil had not attended any social functions in years and, contrarily, Mrs. Napier and her husband “went to very nice parties” arid had occasion to use and enjoy the earrings. She further explained that she wanted Mrs. Napier to have physical possession of the earrings prior to her death so that Mrs. Napier would not have to go through the trouble of asking to borrow the earrings each time she had an event to attend and, also, Mrs. Blanton would not have to go through the trouble of obtaining the earrings from her safety deposit box. Mrs. Blanton testified that she asked Mrs. Napier to obtain an updated appraisal on the earrings and to acquire an insurance policy to insure the earrings in order to protect her asset “from a business standpoint;”
Mrs. Blanton testified that, iri that same August 2008 conversation, Mrs. Napier mentioned how she “wish[edj it had been the pearl bracelet” because she loved the pearl bracelet. Mrs. Blanton said she wás “taken back” but explained to Mrs. Napier that she would speak with her husband and she decided to “let [Mrs. Napier] borrow that long-term as well.” A week or two thereafter, Mrs. Blanton retrieved thé pearl bracelet from the safety deposit box and brought it to Mrs. Napier’s office;
Mrs. Napier testified, contrarily, that Mrs. Blanton gave her the diamond earrings during the August 2008 conversation while the two sat at her kitchen table. She explairied that Mrs. Blanton gave her the earrings essentially as a thank-you for having saved her life in the hospital earlier that year. Both women testified that in the spring of 2008, Mrs. Blanton was hospitalized for a surgery when a machine malfunctioned and caused Mrs. Blanton to “code.” Mrs. Napier was at Mrs. Blanton’s side at the time and rushed to alert the nurse of the machine’s malfunction. Mrs. Napier testified that Mrs. Blanton never mentioned her will in that conversation nor did she tell her that the diamond earrings were only being loaned to her pending Mrs. Blanton’s death. At trial, Mrs. Napier submitted a Last |sWill and Testament drafted by Mrs. Blanton on October 18, 2013, prior to the initiation of the dispute surrounding this litigation, wherein Mrs. Blanton makes no reference whatsoever to a bequest of a pair of diamond earrings or pearl bracelet. Mrs. Blanton, however, testified that she had a notebook in which she wrote to whom she would like to have small items, such as jewelry and furnishings, bequeathed.[1]
Concerning the pearl bracelet, Mrs. Napier could not recall the circumstances under which she obtained the pearl bracelet, only that Mrs. Blanton delivered the bracelet to her office within a week or two following the transfer of the diamond earrings. Shortly after the August 2008 conversation and physical transfer of the two pieces of jewelry, Mrs. Napier wrote Mrs. Blanton a thank-you note, which stated, “[k]nowing you even want me to have something of yours is such an honor and I will always think of you proudly and with a smile on my face whenever I am wearing your beautiful jewelry.” Mrs. Napier testified that she held herself out to be the owner of the jewelry and told all of her friends that Mrs. Blanton gave her the jewelry at issue.
*317 In October 2011, Mrs. Blanton’s husband, Mr. DuTreil, passed away. Within a few years, Mrs. Blanton married Kevin Blanton. Mrs. Napier and her husband attended the wedding and hosted a brunch the following morning for Mrs. Blanton’s new husband’s grown children and his grandchildren. Mr. and Mrs. Blanton stayed at the Napier’s home for approximately one week prior to the wedding and the Napiers drove the Blantons to the cruise ship in New Orleans for their honeymoon. When Mr. and Mrs. Blanton returned from their honeymoon, they stayed an additional two nights at the Napier’s home while the Napiers vacationed in Las Vegas. Apparently, Mr. and Mrs. Napier returned to their home on a Monday evening and Mr. and Mrs. Blanton left the Napiers’ home early the | .(following Tuesday morning. After each couple returned from vacationing, they did not say “hello” or “good-bye” to each other. Mrs. Napier testified that when she awoke Tuesday morning, before she left for work, she noticed a note on the table from Mrs. Blanton asking if she and Mr. Blanton could simply leave the house keys in the home and exit through the garage. Mrs. Napier understood this to mean that the Blantons did not intend or could not “bother to come say goodbye” before they left. Mrs. Napier was “disappointed that she couldn’t bother to think that maybe I wanted to say good-bye.” She indicated that she thought Mrs. Blanton could have traveled to Mrs. Napier’s office in Kenner, approximately five miles from her home, to drop off the house keys and to say goodbye.
According to Mrs. Blanton, she left a thank-you note on a table in Mrs. Napier’s home, thanking the Napiers for their hospitality during the wedding and for allowing the Blantons to stay in the Napiers home following the honeymoon. Mrs. Blan-ton explained that she and Mr. Blanton were already in bed when the Napiers returned home Monday evening. She further explained that on Tuesday morning she and Mr. Blanton ran errands and took care of some business prior to driving home to Mississippi.[2]
The record reflects that very little to no communication took place until two weeks later, March 16, 2014, when Mrs, Blanton forwarded an email to Mrs. Napier. In the email, Mrs. Blanton again thanked Mrs. Napier for her hospitality before and after the wedding. Additionally, in that email, Mrs. Blanton informed Mrs. Napier that she had colored her hair a honey blonde color and was having a fence constructed and other work performed on her new home in Mississippi.
Mrs. Napier testified that she did not initially respond to the March 16, 2014 email because she was still upset that the two did not say good-bye to each other, [sand Mrs. Napier left shortly thereafter for a 2 week trip to Hawaii with Mr. Napier. Mrs. Blanton became upset that Mrs. Napier did not respond to her March 16,2014 email.
The two women then exchanged additional correspondence, but provided conflicting testimony concerning the sequence or timing of the next correspondence exchanged. Mrs. Blanton forwarded correspondence to Mrs. Napier, stating “it is obvious that you are miffed at me,” referencing their three decade friendship and questioning why Ms. Napier had not responded to her March 16, 2014 email. In that correspondence, Mrs. Blanton makes *318 her first written request for the return of the jewelry:
I am wondering now if I saw more in our relationship than you did all these years. Maybe I as merely an acquaintance to you. If so, then I have made a big mistake. I am not in the habit of giving such generous bequests to acquaintances. The jewelry that I gave to you might be a most unpleasant reminder, and I wouldn’t want to be the source of unpleasantness. You may simply ship it back to me at your earliest possible convenience, and I will definitely reimburse you for the postage and insurance.
Mrs. Napier also sent two letters to Mrs. Blanton during the same time frame, one letter she stated she had written for “therapeutic” purposes but never intended to mail, and another letter she testified she wrote in response to Mrs. Blanton’s written letter and demand for the jewelry. In Mrs. Napier’s letter, she responded that she was not “miffed” but was hurt and disappointed that Mrs. Blanton did not tell her good-bye in person when she left Mrs. Napier’s home following her honeymoon before returning to Mississippi. Mrs. Napier also took issue with the vows exchanged between Mr. and Mrs. Blanton during their wedding ceremony. In the letter that Mrs. Napier testified she did not initially intend to mail, Mrs. Napier referenced Mrs. Blanton’s wedding vows and voiced her disapproval. Mrs. Napier found that the language Mrs. Blanton used in her vows, stating that she was the “safest I have felt in my life” and “happiest I have | (¡ever felt in my life” was disrespectful to her deceased former husband, Mr. Du-Treil. Mrs. Napier’s letter further referenced Mrs. Blanton’s “new life, new husband, a new house, a new car, new hair color, new vocabulary, new way of dressing, and I guess you want new friends. I know Greg wanted you to be happy. He loved you so. I can’t help thinking how disappointed in you he would be.”
Concerning the jewelry, Mrs. Napier’s first written response stated:
I didn’t know the jewelry you gave me came with so many attachments and stipulations.... I didn’t know you felt like it was always something you could dangle in front of my nose. I find that disgusting.
Mrs. Blanton admitted that Mrs. Napier’s comments concerning her deceased husband “got the best” of her. Mrs. Blan-ton forwarded another letter to Mrs. Napier, again referencing the jewelry and stating:
[A]re you going to return the pearl bracelet & diamond earrings or not? I doubt you would ever feel comfortable wearing them again since they came from such a self-centered despicable person. You conveniently did not answer that one. I will reimburse you for the shipping & full insurance coverage.
Mrs. Napier did not respond to this correspondence, which resulted in the initiation of this suit.[3]
Mr. James Zimmerman, Mrs. Napier’s brother, testified at trial that he was at Mrs. Napier’s home on the night that Mrs. Blanton gave her the diamond earrings at issue. He stated that he was not present during the exchange, but walked in shortly thereafter and observed both women “kind of teared up.” He asked the women if they were ok, to which he stated Mrs. Blanton replied, “yes... I just gave Beverly my diamond earrings.” Mr. Zimmerman testified that Mrs. Napier had the earrings in *319 her ear. He acknowledged that he left the room shortly thereafter and |7that he did not hear any of the conversation leading up to the transfer of the earrings.
Mr. Timothy Napier, Mrs. Napier’s husband, testified at trial that on the night in question he and Mrs. Napier hosted a thank you dinner or gathering to thank family and friends for their support following the death of Mrs. Napier’s aunt. Mr. Napier testified that he was not present in the room at the time that Mrs. Blanton handed the earrings to Mrs. Napier, but he did walk into the room at some point and heard Mrs. Blanton explaining to Mrs. Napier how to take care of the earrings and thanking Mrs. Napier for saving her life.
Following trial, the trial judge took the matter under advisement. On January 12, 2016, the trial judge issued a judgment in favor of Mrs. Blanton, finding that Mrs. Blanton did not donate but rather loaned the jewelry to Mrs. Napier and ordering Mrs. Napier to return the jewelry to Mrs. Blanton.[4]
DISCUSSION
In this appeal, Mrs. Napier first argues that the trial judge was clearly wrong in her determination that the physical transfer of the jewelry was a loan to Mrs. Napier rather than a donation or gift in response to Mrs. Napier saving Mrs. Blan-ton’s life months prior. Alternatively, Mrs. Napier argues that she acquired ownership of the jewelry at issue through acquisitive prescription pursuant to La. C.C. art. 3490. For the following reasons, we find that the trial judge was not manifestly erroneous in her factual finding that Mrs. Blanton did not intend to donate the jewelry to Mrs. Napier. We further find that the trial judge was not manifestly erroneous in denying Mrs. Napier’s claim to the jewelry by acquisitive prescription under La. C.C. art. 3490.
|»An inter vivos donation is a contract by which a person, called the donor, gratuitously divests himself, at present and irrevocably, of the thing given in favor of another, called the donee, who accepts it. La. C.C. art. 1468. Pursuant to this article, in order for the donation to be valid, there must be a divestment, accompanied by donative intent. Schindler v. Biggs, 06-0649 (La.App. 1 Cir. 06/08/07), 964 So.2d 1049, 1053. Additionally, acceptance of the object offered must be made by the donee during the donor’s lifetime and by authentic act, unless otherwise expressly permitted by law. La. C.C. arts. 1541 and 1544. The burden to prove that a donation has occurred is on the donee and the proof must be by clear and convincing evidence. O’Krepki v. O’Krepki, 16-50 (La.App. 5 Cir. 05/26/16), 193 So.3d 574, 579.
The Civil Code provides two exceptions to the rule that inter vivos gifts be made by authentic act, the application of which depends on whether the object of the donation is a corporeal or incorporeal movable. La. C.C. art. 1543 provides that the inter vivos donation of a corporeal movable may be made by delivery of the thing to the donee without any other formality. This exception is found in La. C.C. art. 1543 and refers to manual gifts. O’Krepki v. O’Krepki, supra at 579; Succession of Miller, 405 So.2d 812, 819 (La. 1981).
La. C.C. art. 1543, titled “manual gifts,” provides that “[t]he donation inter vivos of a corporeal movable may also be made by delivery of the thing to the donee *320 without any other formality.” Although no formal written act is required, “a manual gift requires both delivery and donative intent.” Succession of Wagner, 08-0212 (La.App. 1 Cir. 08/08/08), 993 So.2d 709, 718. Donative intent is a factual issue subject to the manifest error standard of review. Thus, a trial court’s finding on this issue cannot be reversed unless an appellate court, after review of the entire 18record, finds both that no reasonable factual basis exists for the finding and that it is manifestly erroneous or clearly wrong. Id.; see also Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880, 882 (La. 1993).
Under the manifest error standard of review, a district court’s reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review, even though the court of appeal is convinced that had it been the trier-of-fact, it would have weighed the evidence differently. Driscoll v. Stucker, 04-0589 (La. 1/19/05), 893 So.2d 32, 46. As the trier-of-fact, a trial court is charged with assessing the credibility of witnesses and, in so doing, is free to accept or reject, in whole or in part, the testimony of any witness. Durapau v. Kallenborn, 09-79 (La.App. 5 Cir. 05/26/09), 13 So.3d 1201, 1206. When factual findings are based upon determinations regarding the credibility of witnesses, the manifest error standard demands that great deference be accorded to the trial court. Hitchen v. Southland Steel, 05-1708 (La.App. 1 Cir. 6/9/06), 938 So.2d 123, 126.
Upon review of the record in this case, we cannot say that the trial judge was manifestly erroneous in her factual finding that Mrs. Blanton lacked the dona-tive intent to donate the jewelry at issue to Mrs. Napier. The trial judge, after hearing the testimony and considering the evidence introduced at trial, made the factual determination that Mrs. Blanton never intended to irrevocably give the jewelry to Mrs. Napier. The record presented conflicting testimony concerning exactly what was said during the August 2008 transfer of the jewelry. Based upon the record and Mrs. Blanton’s testimony in which she stated that she intended to loan the jewelry to defendant and to bequest the earrings to Mrs. Napier at the time of her death, we find there is a reasonable factual basis to support the trial court’s findings.
Alternatively, Mrs. Napier contends that she has acquired the jewelry through three-year acquisitive prescription. Under La. C.C. art. 3490, title to 11nmovables may be acquired through prescription of three years by a good-faith possessor. To establish three-year acquisitive prescription under article 3490 to a moveable that qualifies as a manual gift, one must establish possession as owner in good faith for a period of three years without interruption. The party asserting acquisitive prescription has the burden of proving all facts essential to support each element of the article. Mere physical possession of the moveable is insufficient. Succession of Wagner, supra at 722.
Although it is undisputed that Mrs. Napier had physical possession of the jewelry for more than three years, mere physical possession is insufficient. Mrs. Napier, as the party asserting the defense of acquisitive prescription, carried the burden at trial to prove that she possessed the jewelry as owner and in good faith for a period of three years. Other than her self-serving testimony that she “told” everyone that the jewelry belonged to her, Mrs. Napier put forth no additional fact witnesses or physical evidence (e.g. an updated appraisal or insurance policy listing Mrs. Napier as the owner of the jewelry, or testimony from friends or acquaintances) to prove that she possessed the jewelry as owner.
*321 The trial judge clearly denied or dismissed Mrs. Napier’s claim that she acquired the jewelry through acquisitive prescription. Because the record supports the trial judge’s factual finding that Mrs. Blan-ton never intended to give the jewelry to Mrs. Napier, in addition to the lack of evidence supporting Mrs. Napier’s claim that she possessed the jewelry as owner while it was in her physical possession, we find the trial court was not manifestly erroneous in her finding that Mrs. Napier did not acquire the jewelry through three-year acquisitive prescription.
| iiAccordingly, for the reasons provided above, the trial court judgment is affirmed.
AFFIRMED

. Mrs. Blanton incorrectly referred to this notebook as a “codicil” to her will. The notebook was not introduced into evidence.

. Mrs. Blanton testified that she received a phone call from her physician, indicating that she had been diagnosed with insulin-dependent Type II diabetes and needed medication as soon as possible.

. On October 20, 2014, Mrs. Blanton’s counsel forwarded correspondence to Mrs. Napier, instructing Mrs. Napier to return the jewelry at issue or to submit a payment in the amount of $10,600.00 should she no longer be in possession of the jewelry.

. After the initiation of this lawsuit, Mrs. Blanton's counsel forwarded correspondence to Mrs. Napier referencing Mrs. Blanton's intent to file a police report for the theft of the jewelry and institute criminal prosecution for Mrs. Napier’s refusal to return the jewelry. As a result, Mrs. Napier filed a motion to deposit the jewelry into the registry of the court.